**In re FIRST TULSA PARTNERS, a Texas limited partnership, Debtor.**

**Bankruptcy No. 88–00161–C.**

United States Bankruptcy Court, N.D. Oklahoma.

Sept. 19, 1988.

584

Andrew Turner, Conner & Winters, Tulsa, Okl., for debtor.

Jonathan Alden, Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Okl., for Guaranty Fed. Savings and Loan Creditor's Committee.

Teri Thomas, for Clifford S. Harrison.

Patrick O'Connor, for Sunbelt Savings & Loan Assoc. of Texas.

Christopher Weil, for Theodore Store.

## AMENDED MEMORANDUM DECISION AND ORDER

STEVEN J. COVEY, Bankruptcy Judge.

This matter comes on for hearing to determine the value of an office complex located in the central business district of Tulsa, Oklahoma, commonly known as First Place (the "Property"), which is the primary asset of the debtor.

The court, on August 2, 1988, heard testimony consisting of income and expense projections, comparable sales data and valuation methodology. Evidence was introduced as to the value of the Property based on direct capitalization; yield capitalization, or as such approach is more commonly known, discounted cash flow analysis; analysis of certain market data and income analysis.

After hearing and considering the evidence as presented, the court determined the value of the Property to be Twenty One Million Dollars ($21,000,000.00). The major secured creditor of the debtor, Guaranty Federal Savings and Loan Association ("Guaranty"), which holds a claim against the debtor in excess of $53 million, filed a motion for reconsideration of this court's finding. The court granted said motion, limiting the introduction of evidence to that of willing buyers and an analysis of the various rates employed by the parties' valuation experts, including discount rates and capitalization rates applicable to commercial real estate transactions.

This court, having heard and considered the evidence presented at the second valuation hearing, makes the following findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

### Findings of Fact and Conclusions of Law

The property consists of two office buildings located in Tulsa, Oklahoma, consisting of Lots 1, 2, 3, 4 and 5 of Block 1, First Place Addition to the City of Tulsa, County of Tulsa, State of Oklahoma.

The office buildings consist of a forty-one story structure (the "Tower") and a nineteen-story structure (the "Midrise") containing 425,982 and 190,943 square feet of rentable area, respectively, aggregating 616,925 square feet of leaseable space.

The buildings are currently sixty-eight percent occupied, reflecting the continuing poor economic conditions affecting the commercial real estate market in Tulsa. Comparable office spaces in the Tulsa market have occupancy rates ranging from twenty-five percent, as exemplified by the Adams Building, to ninety-two percent, as in the Bank of Oklahoma Tower. These rates reflect occupancies of both Class "A" and Class "B" buildings, of which the Tower is considered Class "A" and the Midrise considered Class "B".

The downtown Tulsa office market is "sluggish" having been adversely affected by the continuing recession in the oil-based

economy. An example of the direct effect of the recession on the commercial office market is the recent relocation of Reading and Bates from Tulsa to Houston. Reading and Bates, a large oil and gas drilling and exploration company, was the largest tenant in the MidContinent Tower, a building in close proximity to and in direct competition with the subject Property. The MidContinent Tower is a newer building than is the subject Property and is not faced with the asbestos problem which plagues the subject.

The subject Property currently has asbestos insulation located primarily in the Tower. Due to the universally recognized potential health hazard, the asbestos will require abatement or removal. Although ambiant air sample tests show no present asbestos exposure level, the court finds the problem of such magnitude that the abatement or removal program will have to be addressed immediately. The court finds the cost of asbestos removal to be $1.7 million per year for five years, or a total of $8.5 million. Because this expense is spread over a five-year period, its present value is $6.8 million.

The debtor and Guaranty have each calculated the projected occupancy of the Property. The projected occupancy figures of the debtor are somewhat more pessimistic than those of Guaranty. The disparity in the occupancy rates can be best shown by the comparison of the average projected net operating income generated by the projected occupancy rates. The debtor's experts estimated the projected net operating income over seven years, inclusive of 1988, to be $2,414.948 per year. Guaranty's experts estimated the average annual net operating income for the same period to be $3,296,640. The difference in the respective net operating income figures can partially be attributed to a disparity in the projected costs associated with the administration and operation of the building. The remainder of the disparity is attributable to the differing projected occupancy rates.

Substantial testimony was given as to the appropriate capitalization rates and discount rates which should be used to determine the total value of the Property. The testimony in regard to the capitalization rates varied from nine percent to twelve percent, and in regard to the discount rates, from twelve percent to fifteen percent. As discussed below, capitalization rates are used if the court utilizes the direct capitalization method of determining value. Discount rates are used if the court utilizes the yield capitalization computation method.

It should be noted that the court, in arriving at its valuation of the Property, has relied heavily upon the article entitled *Valuation in Bankruptcy Proceedings* by United States Bankruptcy Judges David W. Houston, III and James F. Queenan, Jr., which article was presented at the May 88 Seminar for Bankruptcy Judges in San Antonio, Texas. A copy of this article has been placed in the case file and is incorporated herein by reference.

Said article, on page 31, defines the direct capitalization method of determining value as follows:

> Direct capitalization is a method utilized to convert a single year's estimate of income or an averaged income into a value indication. This is accomplished by either dividing the income estimate by an appropriate income rate or by multiplying the income estimate by an appropriate income factor.... Direct capitalization may be based upon potential gross income, effective gross income, net operating income, equity income, mortgage incomes, etc.

That same article, on pages 36 and 37, defines the yield capitalization method as follows:

> Yield Capitalization is a method utilized to convert future benefits to present value by applying an appropriate yield or discount rate. To use this method, reasonable estimates of future cash receipts or income must be obtained along with the liquidation or residual value at the end of the investment period. Alternatively, a stable cash flow may be projected indefinitely.

This court, after analyzing the two methods, finds that each, when properly applied, produce basically the same result in the instant case. This court has decided to utilize the direct capitalization method because it is easier to apply and does not involve as much speculation and conjecture as to the future residual value of the Property.

In order to apply the direct capitalization method, the court must first determine the average projected income for a definite number of years (the court, based upon the evidence herein, has decided to use a seven-year period). There must be applied to this figure an appropriate multiplier which is determined by dividing the capitalization rate into one hundred. For example, a capitalization rate of twenty would produce a multiplier of five. It is obvious that the higher the capitalization rate, the lower the value of the Property.

In determining a proper capitalization rate, the court has applied the following, as discussed on pages 28 and 29 of the referenced article:

In general, when deciding the appropriate rate of capitalization, as well as, when predicting future earnings, the lack of mathematical certainty becomes apparent. Nevertheless, even though no precise formula has been developed to determine the capitalization rate, general agreement does exist concerning the basic principals of choosing an appropriate rate. Many courts agree that the capitalization rate should reflect the market free interest rate, based upon long term government paper, to which is added an interest component that reflects the risk inherent in the enterprise and the industry.

As in forecasting future expected earnings, setting the rate of capitalization is best determined on a case by case basis, and any factors that appear relevant to a specific company's risk evaluation may be utilized to determine the rate of capitalization.

In the instant case, after applying all of the factors above and taking into consideration the capitalization rate used on comparable sales in the Tulsa area, the rate used in other parts of the country (particularly in Houston, Texas), the risks involved in investing in office buildings in downtown Tulsa, and the condition of the Tulsa economy, the court has chosen a ten percent discount rate, which, when divided into one hundred, gives a multiplier of ten.

The next factor in the equation is to determine the projected net operating income for the next seven years. As indicated above, the testimony varies greatly on this point. This court, again after reviewing the economic factors discussed above, finds that a reasonably anticipated projected income figure is $2.8 million per year. This determination gives weight and credence to the expert testimony presented by both the debtor and Guaranty.

The annual net operating income ($2.8 million) multiplied by ten, results in a starting value of $28 million for the Property. From this amount, there must be deducted the cost of asbestos removal. This court accepts the present value of the cost of asbestos removal as the proper amount. Therefore, $6.8 million must be deducted from $28 million, leaving a balance of $21,-200,000.00 which the court finds to be the present value of the Property. It should be noted that this is approximately the same figure used in this court's original order. This is because the above method of determining value is substantially the same method originally used by this court. No evidence was offered at the rehearing which persuades the court to substantially alter its original calculations and valuation.

There are two additional problems which significantly depress the value of the Property and prevent the court from giving it a higher value. First, a new buyer will have to finance a $21 million mortgage at an interest rate of at least eleven and one-half percent on a thirty-year amortization. This means, in order to service the mortgage debt alone, a new owner will have to pay $2,519,316.00 per year. Even if the projected annual income as estimated by the court is realized, it will barely be enough to service the mortgage debt. Secondly, any new owner will have to invest new money,

up to $1.7 million per year for five years to remove the asbestos. Finally, the court should comment on the testimony of Mr. Lee Hansen, Vice–President of Dutch Property Investments, Inc., a Colorado corporation. Mr. Hansen testified that his organization would purchase the Property for $23.5 million if offered financing which included a one hundred percent non-recourse note and mortgage with a fifteen year term and a standard thirty year amortization at a fixed rate of eleven and one-half percent. Mr. Hansen offered a $200,000 earnest money payment which would be forfeited as liquidated damages upon abrogation of the contract. On cross-examination, it was shown that Mr. Hansen's offer was subject to a physical inspection of the Property, an analysis of the debtor's books and records and an independent determination of net operating income yield. If satisfied with those indicies of income potential, the offer would be viable. If not satified, Dutch Property Investment would withdraw the offer. The liquidated damages provision would be effective only if the inspections revealed no difficulties and the company still refused to close.

The court finds that the offer to purchase is not a true offer, but is simply an initial proposal or trial balloon. Even if this court were to accept the offer, it should be noted that Dutch Property Investments, Inc. is solely owned by four dutch entities whose cost of funds is somewhat lower than that available to domestic investors. Testimony revealed that a one hundred percent non-recourse note at eleven and one-half percent was below market financing and therefore the cash equivalent of the Hansen offer was less than the $23.5 million face value. It should also be noted that Mr. Hansen was unaware of the current debt restructuring undertaken by the Property's primary tenant, First National Bank of Tulsa, which, as Mr. Hansen testified, would affect the terms of the offer. Based upon the evidence, the court finds it must discount the value of Mr. Hansen's testimony.

Accordingly,

IT IS ORDERED that the value of the Property is Twenty–One Million, Two Hundred Thousand Dollars ($21,200,000.00).

IT IS FURTHER ORDERED that the valuation order entered by this court on August 8, 1988, is vacated and held for naught.