**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2346

WANN VAN ROBINSON; MARY D. ROBINSON; THE WANN VAN
ROBINSON REVOCABLE TRUST,

Plaintiffs - Appellees,

v.

JASON CLINT WORLEY,

Defendant - Appellant,

and

BRUCE MAGERS,

Trustee.

Appeal from the United States District Court for the Middle District of North Carolina, at
Greensboro. Thomas D. Schroeder, District Judge. (1:14-cv-01083-TDS; 13-50180; 13-
06081)

Argued: January 26, 2017                    Decided: February 28, 2017

Before WILKINSON, NIEMEYER, and KEENAN, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge
Niemeyer and Judge Keenan joined.

**ARGUED:** Clinton Shepperd Morse, Jeffrey Edward Oleynik, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellant. Rayford Kennedy Adams, III, SPILMAN THOMAS & BATTLE, PLLC, Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** R. Scott Adams, SPILMAN THOMAS & BATTLE, PLLC, Winston-Salem, North Carolina, for Appellees.

WILKINSON, Circuit Judge:

Jason Clint Worley, a Chapter 7 bankruptcy debtor, estimated the value of his interest in a real estate investment company at just 4% of his initial capital contribution. The bankruptcy court found after a bench trial that Worley intentionally lowballed his valuation and accordingly denied his discharge under the false oath provision of 11 U.S.C. § 727(a)(4). The district court agreed. We review that finding for clear error, and for the reasons that follow, we affirm.

## I.

Worley has spent much of his adult life studying and working in the financial industry. In addition to earning a bachelor's degree in finance from the University of Florida and an MBA from Emory University, he worked at Edward Jones as a financial advisor for almost a decade.

During his time at Edward Jones, Worley got caught up in the heady investment environment of the early 2000s and began personally investing in a series of real estate ventures. One of those ventures was Gemini Land Trust, LLC, which Worley formed in January 2006 with his childhood friend, Joshua Crapps. Worley contributed $65,000 for a 49% interest in the company; Joshua Crapps served as managing member and had complete discretion over whether to distribute any profits or retain the proceeds for future transactions. Gemini's sole investment was a 10% share in Pelham Land Group, LLC, which was managed by Crapps's father, Daniel Crapps. Pelham owned 587 acres of Georgia timberland that, in 2012, was worth an estimated $2,250 per acre, or $1.32

million total. The property also generated a few thousand dollars each year from farming, hunting, and timber leases.

Many of Worley's other investments flopped, and he filed for bankruptcy on February 14, 2013. He initially classified the filing as a "no asset" case, signaling to the bankruptcy trustee that he did not own any non-exempt assets that were worth distributing. *See* 11 U.S.C. § 554 (2012) (authorizing the trustee to "abandon [to the debtor] any property of the estate . . . that is of inconsequential value"). On Schedule B to the petition, Worley estimated that his interest in Gemini had a market value of $2,500. He explained that he was unsure how to value the minority stake in Gemini, but sought the advice of counsel and applied the capitalization rate method. Consequently, he took the largest annual distribution he received from Gemini ($483, rounded up to $500) and multiplied by a capitalization rate of five. Worley never consulted with Joshua or Daniel Crapps before estimating the value of his interest, though he admitted that Joshua Crapps would be in a better position to value the company. Worley's Schedule K-1 2012 form for Gemini, the most recent tax return in the record, reflected an individual capital account of $67,555.

Although Worley categorized the filing as a "no asset" case, upon learning that Gemini owned a stake in Pelham, the trustee informed creditors that assets would likely be available for distribution. On September 30, 2013, the plaintiffs here filed an adversary complaint alleging that Worley "intentionally misrepresented the value of his interest in Gemini Land Trust . . . by more than 95 percent." J.A. 314. The creditors therefore sought a denial of discharge pursuant to the false oath provision of § 727(a)(4).

4

The bankruptcy court held a trial on the adversary claim on September 4, 2014. Daniel Crapps explained that the illiquid nature of Gemini's stake in Pelham complicated the valuation analysis: Because only "buzzards" were interested in minority LLC shares, Gemini would fetch no more than 20-30% of its capital account. J.A. 532-33. Nonetheless, he surmised that Gemini's 10% share in Pelham could be sold for at least $26,000 and dismissed the idea that Worley's interest was worth "something like 2,500 or something that low." J.A. 534. Joshua Crapps echoed his father's assessment. Although he had "no idea" what the value of his share of Gemini was, he agreed that its value exceeded $2,500 and depended on the appraised value of the land held by Pelham. J.A. 1047. Finally, the bankruptcy trustee testified that he did not sense that Worley was "stonewalling" him and emphasized that the values assigned to scheduled assets are just "starting points." J.A. 191, 202. The trustee did note, however, that one day before trial he discovered that Pelham sold a large tract of land for approximately $2,100 per acre and distributed $100,000 to Gemini.

A week after the trial, the bankruptcy court denied Worley's discharge under § 727(a)(4). The court first held that Worley made a "false oath or account" by understating the value of Gemini on his schedule of assets. While it acknowledged that Gemini's illiquid interest in Pelham might be worth less than the appraised value of the underlying timberland, the court concluded that—in light of his capital contribution and Pelham's recent $100,000 distribution to Gemini—Worley's $2,500 estimate was "so low as to be unrealistic." J.A. 294. Second, the court found that Worley acted with the

5

requisite fraudulent intent because the use of the capitalization rate method was "inconsistent" with his knowledge and "extensive background in finance." *Id.*

On September 30, 2015, the district court affirmed the denial of discharge. As a threshold matter, the district court rejected Worley's argument that a debtor's undervaluation of a single asset is insufficient to warrant a denial. It then concluded that the bankruptcy court did not clearly err in finding that Worley intentionally "lowball[ed] his interest in Gemini." J.A. 1432. Even though Worley claimed to rely on the advice of counsel, the bankruptcy court could plausibly have concluded that any such reliance was unreasonable given Worley's "extensive investment history" and knowledge of the capitalization rate method. J.A. 1437.

II.

The primary benefit of filing for bankruptcy under Chapter 7 is that discharge offers the debtor "a fresh start unhampered by the pressure and discouragement of preexisting debt." *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994). This privilege, however, is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 287 (1991). Section 727(a) of the Bankruptcy Code provides that a bankruptcy court "shall grant the debtor a discharge," but then describes twelve scenarios where a debtor is not entitled to such relief. 11 U.S.C. § 727(a) (2012).

One of those exceptions, found in § 727(a)(4), provides that the court should deny discharge if "the debtor knowingly and fraudulently, in or in connection with the case[,] made a false oath or account." 11 U.S.C. § 727(a)(4)(A). To run afoul of this provision, "the debtor must have made a statement under oath which he knew to be false, . . . he

6

must have made the statement willfully, with intent to defraud," and the statement "must have related to a material matter." *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987).

The statute invites the bankruptcy court to strike a balance between two competing objectives. At bottom, bankruptcy is an equitable remedy that elevates "substantial justice" over "technical considerations." *Pepper v. Litton*, 308 U.S. 295, 305 (1939). Given the harsh consequences of a denial of discharge, the statute is ordinarily construed liberally in the debtor's favor. *Smith v. Jordan* (*In re Jordan*), 521 F.3d 430, 433 (4th Cir. 2008). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 110 (1st Cir. 1987). In this vein, the provision—although a civil statute with civil sanctions— incorporates a classic criminal law element of mens rea that involves an assessment of whether the debtor made the false statement "knowingly and fraudulently," as opposed to carelessly. 11 U.S.C. § 727(a)(4)(A).

At the same time, the statute reflects the equitable doctrine of unclean hands. The purpose of the false oath exception is to ensure that "those who play fast and loose with their assets or with the reality of their affairs" do not profit from the liberating shelter of the Bankruptcy Code. *Farouki*, 14 F.3d at 249. The implicit bargain for discharge is simple: candid, good faith disclosure of the debtor's financial affairs in return for the freedom of a clean slate. *In re Kestell,* 99 F.3d 146, 149 (4th Cir. 1996). The goal is to spare trustees and creditors from having to undertake time-consuming investigations into the existence of every asset or costly audits of property whose value cannot be fixed at a

glance. After all, "[t]he successful functioning of the bankruptcy act hinges upon both the bankrupt's veracity and his willingness to make a full disclosure." *In re Mascolo*, 505 F.2d 274, 278 (1st Cir. 1974).

Entrusted with issuing any order that is "necessary" to carry out the provisions of the Code, 11 U.S.C. § 105(a) (2012), the bankruptcy court is particularly suited to weigh these competing considerations, which often boil down to an assessment of a debtor's credibility. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is thus a question of fact that we review for clear error. *Williamson*, 828 F.2d at 251. "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).

### III.

Against this backdrop, we turn to Worley's challenges to the bankruptcy court's denial of discharge, each of which relates to a different element of § 727(a)(4)(A).

### A.

Worley begins by asserting that he did not falsely state the value of his interest in Gemini. He contends, first, that using the capitalization rate method to value his stake was reasonable and, second, that the bankruptcy court did not properly account for his limited economic rights in the company. He claims that the bankruptcy court correctly discounted Gemini's illiquid, minority stake in Pelham, but then it stopped short and failed to apply a successive discount to Worley's 49% share in Gemini—an illiquid,

8

minority interest with no right to distributions until the dissolution of the company. In view of his limited control rights, Worley argues that the $2,500 estimate cannot qualify as a false oath.

We disagree. A debtor's sworn representation to the value of an asset in Schedule B counts as an "oath" for the purposes of the statute. *See Williamson*, 828 F.2d at 250 (affirming denial of discharge under § 727(a)(4)(A) based on misrepresentations in a statement of financial affairs). And a careful examination of the record, on clear error review, does not leave us with a definite impression that the bankruptcy court's rejection of Worley's valuation was mistaken. On the contrary, there is ample evidence to support the court's conclusion that the estimate was "false."

For starters, Worley assessed his interest in Gemini using an income-based valuation method that was bound to assign a paltry figure to property such as the Pelham farmland that earned no more than incidental income. Indeed, his $2,500 estimate relied solely on the capitalization rate method, which "determines the value of an *income producing* property by first determining the *stabilized* net operating income . . . and then [multiplying] by a capitalization rate." *Laconia Savings Bank v. River Valley Fitness One, L.P.*, 2003 WL 252111, at *1 (Bankr. D.N.H. 2003) (emphasis added). Because valuations under the capitalization rate method are a function of the income an asset generates, *see In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 310-11 (Bankr. C.D. Ill. 2003), the method is best suited to properties earning a steady stream of income, *see In re Southmark Storage Assocs. L.P.*, 130 B.R. 9, 14 (Bankr. D. Conn. 1991) (applying the approach to a storage facility); *In re First Tulsa Partners*, 91 B.R. 583, 586 (Bankr. N.D.

9

Okla. 1988) (using capitalization rates to value office buildings). Accordingly, when assets have not achieved a stabilized level of revenue, the capitalization rate method paints a "skewed and discordant picture of reality." *Union Pac. R.R. Co. v. State Tax Comm'n*, 716 F. Supp. 543, 555 (D. Utah 1988) ("[O]ne would be forced to conclude that a company with a net loss for the year or over a period of years actually had a negative value.").

The rural farmland owned by Pelham was undeveloped and, as noted, earned only incidental income. Daniel Crapps did not pitch the property as a "cash flow deal" offering steady returns; the annual revenue from farming and hunting licenses generated just 1% of the land's purchase price. J.A. 533. Pelham instead aimed to capitalize on market timing and flip the farmland at a premium. J.A. 1074-75. Consequently, an income-based approach could not capture the full value of the property. Because the capitalization rate method does not account for the speculative value of the undeveloped acreage, the valuation overlooked the entire basis for the investment. The bankruptcy court could reasonably find, therefore, that Worley's capitalization rate approach was manifestly ill-suited for this sort of real estate. Although Worley may not have needed to incur the delay and expense associated with formal appraisals of the property, at a minimum he could have corroborated his estimate with either his partner or Pelham's manager.

Beyond the valuation method itself, the record is replete with evidence supporting the bankruptcy court's finding that Worley's share in Gemini was worth at least five times the value he reported. Three data points in particular indicate that Worley's interest was worth considerably more than $2,500. First, Daniel Crapps testified that Gemini's

minority stake in Pelham would generally sell for 20-30% of its face value (roughly $132,000) and, even taking the 20% figure, Gemini was still worth approximately $26,000. J.A. 532-34. The bankruptcy court extrapolated from the value of the company to note that Worley's minority share was in turn worth at least $13,212.80. Second, Worley contributed $65,000 to acquire his minority interest and the 2012 Schedule K-1 form reflected a capital account of $67,555. Finally, on the eve of the trial, Pelham sold a majority of its farmland and planned to distribute $100,000 to Gemini.

Worley asserts that his estimate was nonetheless reasonable given his inability to control Gemini or direct the distribution of gains. But this argument about economic rights and additional liquidity discounts misses the forest for the trees. The bankruptcy court accepted Worley's contention that the value of a minority stake is worth a fraction of its face value, yet still found that Worley's estimate was "so low as to be unrealistic." J.A. 294. Simply put, the disparity between the $65,000 initial contribution and $2,500 valuation did not hang together, especially since Worley points to no calamitous event that would lead to such a steep decline in value. (Indeed, as noted, Pelham succeeded in selling a large tract of land just before trial.) On these facts, the bankruptcy court could justifiably conclude that Worley's investment in Gemini did not depreciate to just 4% of his initial capital contribution.

We recognize, of course, that real estate valuation is as much art as science, and that measurements of intrinsic value more often involve a range of reasonable values rather than a single point estimate. But some valuation models and estimates simply fall

11

outside the realm of common sense. Based on the particular attributes of the investment here, the bankruptcy court was entitled to hold that this was one of those instances.

B.

Worley next asserts that he did not act with fraudulent intent in estimating the value of Gemini. In addition to characterizing the dispute as a mere disagreement on value, Worley argues that he relied on the advice of counsel to arrive at the $2,500 estimate. Both contentions are unavailing. The bankruptcy court reasonably inferred fraudulent intent from Worley's background, course of conduct, and absence of credibility.

Although a false statement made by mistake or inadvertence is not a sufficient ground upon which to base the denial of a discharge, "reckless indifference to the truth constitutes the functional equivalent of fraud." *In re Arnold*, 369 B.R. 266, 272 (Bankr. W.D. Va. 2007). A debtor acts with the requisite intent to deceive when his statement is "incompatible with his own knowledge." *Saslow v. Michael* (*In re Michael*), 452 B.R. 908, 919 (Bankr. M.D.N.C. 2011). Because an adjudication of fraudulent intent "depends largely upon an assessment of the credibility and demeanor of the debtor, deference to the bankruptcy court's factual findings is particularly appropriate." *Williamson*, 828 F.2d at 252.

Here, several pieces of circumstantial evidence indicate that Worley handpicked a valuation methodology that would return a piddling estimate for his stake in Gemini. His background suggested that he knew better than to value his interest using capitalization rates. As a sophisticated financial professional with two finance degrees and nearly a

12

decade of industry experience, Worley was doubtless familiar with valuation methods. Yet despite his extensive training, he applied an income-driven formula to an investment that generated only incidental revenue. Worley's course of conduct was also suspect. He confessed uncertainty about how to value the interest in Gemini, but never confirmed his estimate with Joshua or Daniel Crapps. Rather, Worley proceeded with the $2,500 valuation and filed his bankruptcy petition as a "no asset" case—suggesting an effort to persuade the trustee and creditors to abandon the property. *See In re Pynn*, 546 B.R. 425, 431 (Bankr. C.D. Cal. 2016) ("Debtor approached his bankruptcy schedules seemingly with the idea of persuading his creditors that these assets were of no value to creditors because they were, cumulatively, worth less than the statutory exemptions."). Finally, the bankruptcy court assessed his credibility at trial and determined that his testimony was not "forthcoming and candid." J.A. 272. Taken together, the record does not support the conclusion that Worley's misstatement was a result of simple carelessness.

Nor does Worley's claimed reliance on the advice of counsel excuse his failure to list an accurate valuation. While reliance on counsel generally absolves a debtor of fraudulent intent, *see In re Arnold*, 369 B.R. at 272, the bankruptcy court must still consider whether the debtor acted in good faith, *see Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1199 (9th Cir. 2010). A debtor must demonstrate that he provided the attorney with all of the necessary facts and documentation. *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 897 (Bankr. D.N.D. 1999). Likewise, the advice of counsel is no defense when it should have been obvious to the debtor that his attorney was mistaken. *See In re Tully*, 818 F.2d at 111 ("A debtor cannot, merely by playing ostrich and burying his head

13

deeply in the sand, disclaim all responsibility for statements which he has made under oath.").

We have little difficulty concluding that the bankruptcy court did not clearly err in rejecting Worley's advice-of-counsel defense. Worley testified that he made a complete disclosure of his financial affairs, but there is no evidence that he discussed his $65,000 capital contribution or subsequent K-1 statements with his attorney. Given his conspicuous failure to seek the advice of knowledgeable financial professionals like Daniel Crapps, the bankruptcy court could have determined that any purported reliance on legal counsel was a ruse. And even if an attorney had advised Worley to apply the capitalization rate method and submit a $2,500 valuation, a sophisticated investor could not have relied on such patently inappropriate advice in good faith. After presiding over a bench trial, the bankruptcy court could plausibly conclude, as it did, that Worley was engaged in a pattern of outright dissemblance or cavalier indifference to the truth. J.A. 294.

Again, we emphasize that this case does not boil down to a mere difference of opinion regarding the valuation of an illiquid asset. Juxtaposing the magnitude of the undervaluation with Worley's distinguished training and experience, the bankruptcy court determined that Worley intentionally shortchanged creditors on his Schedule B. Yet we reiterate that a debtor's valuation need not be infallible. There is room for reasonable disagreement, particularly in cases involving large corporate debtors where valuations are typically fraught with uncertainty. *See In re Mirant Corp.*, 334 B.R. 800, 848 (Bankr. N.D. Tex. 2005) (acknowledging that valuation of an enterprise is often "not much more

14

than crystal ball gazing"); *In re New York, New Haven & Hartford R.R. Co.*, 4 B.R. 758, 773 (Bankr. D. Conn. 1980) ("[H]ardly a material representation on valuation submitted by one party went unchallenged by another party."). In holding that the undervaluation of Gemini constituted a false oath, we are not opening the door to a scenario in which marginal differences in valuation give rise to a denial of discharge. But Worley's misstatement was anything but marginal.

C.

Worley concludes by arguing that a denial of discharge was unjustified because his alleged statement had no material impact on the outcome of the case. Instead, he argues, to fall within § 727(a)(4)(A) a misstatement must, at a minimum, have the potential to prejudice the rights of creditors. After disclosing the interest in Gemini on his schedules, Worley contends that any putative understatement could not have prejudiced creditors because the trustee "was going to investigate the matter regardless of the Debtor's estimated valuation." App. Br. at 49.

Once more, we disagree. The threshold to materiality is a low bar. As the statute makes clear, any fraudulent misstatement "in or in connection with the case" is sufficient grounds for the denial of discharge. 11 U.S.C. § 724(a)(4)(A). While courts may be "more reluctant to deny a debtor's discharge when assets are undervalued than when they are undisclosed," *In re Zimmerman,* 320 B.R. 800, 807 (Bankr. M.D. Pa. 2005), all that the provision requires for a denial of discharge is a single false account or oath, Schreiber v. Emerson (*In re Emerson),* 244 B.R. 1, 28 (Bankr. D.N.H. 1999). And while Worley suggests that undervaluation of a single asset is really no big deal, nothing in the Code

15

allows a debtor one free falsehood on his schedules if such is knowingly and fraudulently made.

The standard is ultimately one of pertinence rather than prejudice: a misstatement is material if it is "relevant to the debtor's business transactions, estate and assets." *Farouki*, 14 F.3d at 251; *accord Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 618 (11th Cir. 1984) (per curiam) ("The subject matter of a false oath is 'material' . . . if it bears a relationship to the bankrupt's business transactions or estate.").

Pursuant to this rather capacious standard, the bankruptcy court did not err in finding that Worley's misstatement was material. Worley's undervaluation of his only significant, non-exempt asset by many thousands of dollars is undeniably "relevant" to his estate and assets. Indeed, by lowballing his interest in Gemini, Worley sent a message to the trustee and creditors that there was no reason to conduct any further investigation into the property. As we noted earlier, this sort of concealment undermines the efficient administration of the bankruptcy estate. Neither the trustee nor the creditors should have to absorb themselves in a painstaking struggle of "digging out and conducting independent examinations to get the facts." *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir. 1992).

## IV.

Denial of discharge is a severe sanction and should be reserved for instances in which a debtor contravenes the basic compact underlying the Code's promise of a "fresh start." *See Farouki*, 14 F.3d at 249. After careful consideration of the evidence and Worley's testimony at trial, the bankruptcy court determined that this was one of those

16

rare cases: "[T]here are very few debtors that I have denied a discharge to because it is so harsh. . . . And if I struggle with the issue at all, the benefit of the doubt always goes to the debtor. I did not struggle in this case." J.A. 272. A thorough inspection of the record, on clear error review, does not leave us with the definite impression that a mistake has been made. On the contrary, the bankruptcy and district courts proceeded sensibly and carefully throughout.

The judgment is accordingly

*AFFIRMED.*

17