**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2188

JATINDER SHARMA; HAYMARKET FAST FOODS, INC.,

Plaintiffs - Appellants,

v.

USA INTERNATIONAL, LLC; KHALIL AHMAD; MAHRAH BUTT,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, District Judge.  (1:13-cv-01573-LO-MSN)

Argued:  January 25, 2017                          Decided:  March 17, 2017

Before NIEMEYER, TRAXLER, and WYNN, Circuit Judges.

Vacated and remanded by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Traxler and Judge Wynn joined.

**ARGUED:** John Chapman Petersen, SUROVELL ISAACS PETERSEN & LEVY PLC, Fairfax, Virginia, for Appellants.  **ON BRIEF:** Stephen P. Pierce, SUROVELL ISAACS PETERSEN & LEVY PLC, Fairfax, Virginia, for Appellants.  Jeffrey S. Poretz, MILES & STOCKBRIDGE P.C., Tysons Corner, Virginia, for Appellees.

NIEMEYER, Circuit Judge:

In October 2013, Jatinder Sharma purchased from Khalil Ahmad and Mahrah Butt two restaurant franchises — a Checkers and an Auntie Anne's — which were located in a Wal-Mart store in Gainesville, Virginia. He paid $600,000 for the restaurants, a price negotiated and based on a multiple of the gross sales of the restaurants. When, after closing, the restaurants' sales only achieved 60 percent of what had been represented, Sharma uncovered evidence leading him to believe that the sales figures supplied by Ahmad had been manipulated to falsely increase them. Sharma commenced this action for fraud and conspiracy, seeking as damages the difference between the price he paid and the actual value of the restaurants based on a multiple of the restaurants' actual sales.

The district court granted the defendants summary judgment, concluding that the plaintiffs had not introduced adequate evidence of their damages, particularly of the actual value of the restaurants at the time of the sale. We conclude, however, that the plaintiffs presented sufficient evidence to create a dispute of material fact as to the amount of their damages. Accordingly, we vacate and remand for further proceedings.


I

Ahmad and Butt were partners in USA International, LLC, the entity that owned and operated the Checkers and Auntie Anne's restaurants. Through their accountant, Sharma learned that Ahmad and Butt were interested in selling the restaurants, and he became interested in purchasing them when the accountant told him that the restaurants were generating high sales figures.

2

During negotiations, Sharma was provided USA International's 2012 tax returns and financial statements prepared by the accountant indicating that the restaurants' combined sales for November and December 2012 were approximately $75,000 per month. Ahmad later provided Sharma with additional financial statements for January and February 2013 showing somewhat lower sales, but he explained that sales were typically lower during that time of the year and assured Sharma that they would increase as the year went on.

The accountant prepared a conditional asset purchase agreement, which the parties executed in March 2013. This preliminary agreement specified a purchase price of $720,000 and made the sale of the restaurants contingent on the stores' reaching $90,000 in combined monthly sales during the two months prior to settlement. After executing the agreement, Ahmad provided Sharma with two further financial statements prepared by his accountant. One statement covered the period from January through March 2013 and showed average monthly sales of $59,416, and the other covered April 2013 and showed sales of $75,712.

In April 2013, Sharma met with Checkers' corporate officials to obtain approval of the transfer of the franchise. During that meeting, Checkers' officials told Sharma that, based on the restaurants' profitability, a purchase price of $720,000 was too high.

Following this meeting with Checkers, Sharma reopened negotiations with Ahmad and the two agreed to a lower sales price of $600,000. In the final purchase agreement that was executed in May 2013, the monthly sales contingency was deleted and the $600,000

3

sales price was allocated between the two restaurants — $350,000 for the Checkers and $250,000 for the Auntie Anne's.

In preparation for closing, Sharma formed Haymarket Fast Foods, Inc., to take title to the restaurants and submitted a loan application to his bank for a portion of the purchase price. In his application, he indicated, based on the financials submitted by Ahmad, that the restaurants had an average monthly gross sales of $67,083.62 for the eight months ending in August 2013. The closing took place on October 14, 2013.

Shortly after Sharma took over the operation of the restaurants, he noticed that his sales figures were only about 60 percent of the sales figures he had been given by Ahmad. Seeking to investigate the reason for the slow sales, he asked employees at two of his food vendors whether his supply orders in the first weeks of operation were different from those of USA International. Both vendors indicated that Sharma's purchases were "in line" with prior purchases that had been made by USA International, and this was confirmed by USA International's earlier food purchase orders issued to the vendors. This fact provided Sharma a "red alert" because, in his view, the restaurants simply could not generate the amount of sales that Ahmad had reported without having purchased more food supplies. He began to suspect that the defendants had somehow inflated their sales numbers and reported those inflated sales numbers in the income statements that had been supplied to him.

Pursuing the matter further, Sharma reviewed his cash registers' transaction histories and observed that, on several occasions, many sales in high dollar amounts were processed in quick succession. These sales were all rung up while Mahrah Butt — one of

4

the partners of USA International and manager of the Checkers restaurant — was logged into the cash register. In addition, employees who had worked at Checkers before Sharma took over told Sharma that Butt had "many times" and on many different days rung up sales that no customer had placed and had directed employees not to make sandwiches even though receipts for them had been printed.

Sharma also conducted an analysis of the Bank of America accounts into which USA International had deposited its proceeds, both from credit card transactions and cash. Those deposits were substantially lower than the amounts represented in the sales records provided to Sharma. For example, for the period from May 2013 to July 2013, the bank account statements showed deposits from credit card transactions and cash in the total amount of $170,316.84. The reported sales figures for that period, however, indicated that the total sales were $222,722.39, an apparent overstatement of over $52,000.

Sharma and Haymarket commenced this fraud action in December 2013 in Virginia state court, naming USA International, Ahmad, and Butt as defendants, and the defendants removed the action to federal court. In their complaint, the plaintiffs alleged that, by inflating sales figures and lying about those figures during negotiations, the defendants fraudulently induced Sharma to pay $600,000 "for a business that [was] worth far less." The complaint also asserted a claim for conspiracy to commit fraud. The plaintiffs sought compensatory and punitive damages.

After discovery, the defendants filed a motion for summary judgment, contending that the plaintiffs could not establish their damages with reasonable certainty and that, in

5

any event, the plaintiffs presented insufficient evidence of their reliance on and the materiality of the alleged misrepresentations.

In considering the motion, the district court concluded that the plaintiffs had presented sufficient evidence to show that the defendants made false representations of material fact with the intent to mislead the plaintiffs about the value of the restaurants and that the plaintiffs reasonably relied on those representations. The court nonetheless concluded that the plaintiffs had failed to submit sufficient evidence to allow a factfinder "to estimate with reasonable certainty the amount of damages plaintiffs sustained."

While the court assumed that the sales price of $600,000 adequately evidenced the restaurants' bargained-for value, it found insufficient evidence of the restaurants' actual value at the time of the sale, which the plaintiffs had claimed was $360,000. Specifically, the court rejected the two methods proposed by the plaintiffs to reach the actual value that they claimed, which were (1) multiplying the restaurants' weekly sales by 36, or (2) multiplying the restaurants' monthly earnings before interest, tax, depreciation, and amortization ("EBITDA") by 48. As the court explained:

> Plaintiffs' methods of calculation, as explained in their answers to interrogatories and in Sharma's deposition testimony, do not conform to any of the generally accepted methods of business valuation, nor has plaintiff offered sufficient evidence that their methods are independently reliable.

Because damages are a necessary element of a fraud claim under Virginia law, the court granted the defendants summary judgment on the fraud claim. It also granted the defendants summary judgment on the conspiracy claim, finding no record evidence suggesting "a meeting of the minds" between Ahmad and Butt.

6

From the district court's judgment dated July 2, 2015, the plaintiffs filed this appeal, challenging only the district court's conclusion that they had presented insufficient evidence of their damages to support a fraud claim under Virginia law.

II

The plaintiffs contend that the evidence they submitted for consideration by the court in deciding the defendants' motion for summary judgment would support a reasonable jury's finding of damages with reasonable certainty. They assert that they provided two acceptable methods of calculating the actual value of the restaurants at the time of the sale — (1) by multiplying weekly gross sales by 36, or (2) by multiplying monthly EBITDA by 48. They argue that these are the same methods "that led the parties to the $600,000 sales figure" and, indeed, are "not just relevant to, but determinative of, the 'actual value' at the time of the closing."

The defendants contend, however, that the plaintiffs' valuation methods fall within none of the "three accepted methods for valuing a business: the income approach, the market approach, and the asset-based approach." Instead, they argue, the plaintiffs' value is based upon "nothing more than speculation."

In our view, the plaintiffs have submitted sufficient evidence of their damages based on a well-accepted income approach to permit a jury to find with reasonable certainty the damages that they suffered. Thus, we conclude that the district court erred in granting the defendants summary judgment on this basis.

7

Under Virginia law, to establish a fraud claim, a plaintiff must prove "by clear and convincing evidence: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994). And in this case, the district court found that the plaintiffs had advanced sufficient evidence to survive summary judgment as to all of those elements except the element of damages. It is therefore only to this element that we turn.

While Virginia law does not require a plaintiff to prove his damages with "absolute certainty," he must provide sufficient evidence for a factfinder to make "an intelligent and probable estimate of the amount of the damages or loss sustained." *Holz v. Coates Motor Co.*, 147 S.E.2d 152, 155 (Va. 1966). And when a transaction involves a transfer of goods or property, the proper measure of damages is "the difference between the *actual value* of the property at the time the contract was made and the value that the property would have possessed had the representation been true," *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 300 (Va. 1999) (emphasis added), the latter often called the *bargained-for value*.

Applying this formula, the district court accepted, for the sake of argument, that the parties' sales price of $600,000 provided sufficient evidence of the restaurants' bargained-for value. We conclude that the district court's assumption was correct. In analogous cases, Virginia courts have treated a sales price as sufficient evidence of the bargained-for value. *See, e.g.*, *Holz*, 147 S.E.2d at 155 (in a breach-of-warranty claim, automobile's sales price established value if parts had not been defective); *Gertler v. Bowling*, 116 S.E.2d 268, 270 (Va. 1960) (similar). While there may be circumstances where a court should question

8

whether a sales price represents the legitimately bargained-for value of goods, here there is ample evidence that the parties negotiated at arms' length to reach the sales price of $600,000. Sharma's unrebutted testimony shows that Ahmad initially sought $750,000 for the restaurants but that Sharma, based on the sales data provided, offered only $700,000. The parties settled on the sales price of $720,000, as included in their preliminary agreement, and then they subsequently negotiated the price down to $600,000, as included in their final agreement. A reasonable factfinder could accordingly conclude that this final sales price reasonably represented the bargained-for value of the two restaurants, which reflected a multiple of the purportedly misrepresented sales data contained in tax documents and income statements that were central to the negotiations.

The parties' negotiation of the sales price based on a multiple of the restaurants' sales figures, however, is also informative as to the *actual* value of the restaurants at the time of sale, which the plaintiffs estimate based on *actual* sales figures. Taking the record in the light most favorable to the plaintiffs, as is required when ruling on a motion for summary judgment, the parties' negotiations presumed that the appropriate, industry-standard multiple for valuing such a business was 36 times weekly sales. Sharma testified to this specifically, stating that, during negotiations over the purchase price, Ahmad "mentioned this was the formula that is . . . industry standard, that weekly sales [were] multiplied by 36." While Ahmad later denied that he relied on such a formula when he valued the restaurants, he nonetheless admitted that the negotiated sales price was based on the restaurants' ability "to do $60,000 to $70,000 a month in sales." Using a multiplier

of 36, Ahmad's reported sales figures would lead to a sales price of somewhere between $540,000 and $630,000, a range that approximates the final sales price of $600,000.

The record also shows that the negotiations conducted after the first preliminary agreement was executed in March 2013 but before the final agreement was executed in May 2013 focused on the restaurants' sales figures. Indeed, the first agreement was conditioned on the monthly sales figures reaching a certain level, and thereafter Ahmad provided Sharma with several additional financial statements showing the restaurants' sales from February to August, seeking to demonstrate that the average monthly sales were in the range of $60,000 to $70,000 per month, as he had initially represented.

Indeed, pervading the entire narrative of these negotiations was an almost singular focus on the restaurants' weekly or monthly sales. Ahmad's accountant triggered Sharma's interest in the business based on the restaurants' sales; Ahmad continued to persuade Sharma to purchase the business based on the restaurants' sales figures; the parties' negotiating positions were justified by sales figures; and indeed Sharma's conclusion that he had been defrauded was shown by demonstrating cooked sales figures. Thus, when the actual sales figures, which were roughly the same before and after the closing, turned out to be only 60 percent of the sales figures represented in the financial statements, Sharma multiplied his actual weekly sales of approximately $10,000 by 36 to establish the actual value of $360,000 at the time of the purchase, claiming damages as the difference between the two figures.

To be sure, the 36 multiplier used to capitalize earnings in this case could be challenged at trial, as could any capitalization rate used to value a business with a stabilized

10

flow of income. But the question before us is not whether 36 is the correct sales multiplier. Rather, the question is whether the plaintiffs provided enough evidence for a factfinder to make "an intelligent and probable estimate" of the restaurants' actual value. *Holz*, 147 S.E.2d at 155.

The district court had before it the evidence that we have pointed to, as well as the plaintiffs' answers to interrogatories, which explained the two valuation methods they used to calculate the restaurants' actual value at the time of the purchase:

> Mr. Sharma was told by defendant Ahmad that the formula he used for calculating the business worth was to take average weekly sales and multiply that figure by 36. Using that formula and an average weekly sales figure of $10,000.00 lead to a valuation of the business presently of $360,000.00.

> Another way Mr. Sharma and Haymarket have valued the business is to analyze the Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA"). The profit and loss statements previously provided in discovery show an average EBITDA for the businesses of $7369 per month. Using a conservative four year return on investment (as opposed to a more aggressive three year approach), the EBITDA is multiplied by 48. This formula values the business at $353,731.00.

Thus, using defendant Ahmad's formula, which was also the purported industry formula — a 36 multiplier of gross weekly sales — Sharma estimated that the restaurants' actual value at the time of the closing was between $353,731 and $360,000. He states that he utilized the more conservative figure of $360,000.

We conclude that, at a minimum, the record supports the plaintiffs' multiplying their weekly sales by 36 to determine the actual value of the restaurants at the time of the purchase. This method is a "capitalization rate method, which 'determines the value of an income producing property by first determining the stabilized net operating income . . . and

11

then [multiplying] by a capitalization rate.'" *Robinson v. Worley*, No. 15-2346, 2017 WL ____ (4th Cir. 2017) (alterations in original) (quoting *Laconia Savings Bank v. River Valley Fitness One, L.P.*, 2003 WL 252111, at *1 (Bankr. D.N.H. 2003)). And the use of a capitalization rate method here is wholly appropriate, as the restaurant franchises "earn[ed] a steady steam of income" before and after the sale. *Id.*

In support of their argument that the plaintiffs' evidence of damages is insufficient, the defendants direct us to several Virginia cases. For instance, they rely on *Patel v. Anand, L.L.C.*, 564 S.E.2d 140 (Va. 2002), where the seller of a ground lease had misrepresented that the lease had clear title. The buyer sued for fraud and sought "the difference in the value of the ground lease that it bargained for and the value of the ground lease that it actually received." *Id.* at 143. The Supreme Court of Virginia overturned the lower court's award of compensatory damages, finding that the plaintiff did not adequately prove the harm caused by the fraud. *Id.* 143-44. *Patel*'s rejection of the plaintiff's evidence seems to have been motivated by the total absence of evidence regarding the actual value of the ground lease with defective title, as the plaintiff had shown only "the amount it paid for the ground lease, $900,000, and the amount of offers that prospective purchasers made for the ground lease" before the misrepresentation was discovered. *Id*. at 143. That evidence, while relevant to the lease's bargained-for value, simply could not establish the lease's actual value, as it did not account for the fact that a lease with defective title retains some value because the defect may be cleared.

Also, the district court relied on *Holz*, 147 S.E.2d 152, to find an inadequate showing of damages. But *Holz* similarly does not support the defendants' position. There, the

plaintiff submitted no evidence of a defective automobile's market value and sought as damages the full price that he paid for the car, arguing that, because the car was valueless to him, it had no market value. Understandably, the court rejected that argument because it was clear that the car had at least some resale value. *See also Wharton, Aldhizer & Weaver v. Savin Corp.*, 350 S.E.2d 635, 636 (Va. 1986) (rejecting, as insufficient evidence of a copier's actual value, the testimony of two partners declaring that the machine had "no value to our firm").

Here, unlike the circumstances in the cases cited by the defendants, the plaintiffs have attempted to estimate with reasonable precision the actual value of the restaurants at the time they purchased them, using the widely accepted income-based approach with a capitalization multiplier that Ahmad purportedly stated was the industry standard and that the parties allegedly used to agree on the $600,000 purchase price. While the defendants are free to question whether, as a factual matter, 36 is an appropriate capitalization multiplier, it does not follow that the plaintiffs' selection of that number is so unsubstantiated that it fails as a matter of law.

In short, the plaintiffs have introduced sufficient evidence of their damages to create a material dispute of fact. Accordingly, we vacate the district court's judgment entered in favor of the defendants and remand for further proceedings on the plaintiffs' fraud claim.

VACATED AND REMANDED